**BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP**
JONATHAN D. USLANER (Bar No. 256898)
(jonathanu@blbglaw.com)
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel:    (310) 819-3470

*Counsel for Plaintiff International Union
of Operating Engineers, Local No. 793,
Members Pension Benefit Trust of
Ontario*

[Additional counsel on signature page]

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

INTERNATIONAL UNION OF
OPERATING ENGINEERS,
LOCAL NO. 793, MEMBERS
PENSION BENEFIT TRUST OF
ONTARIO, on behalf of itself and all
others similarly situated,

        Plaintiff,

    v.

SILVERGATE CAPITAL
CORPORATION, ALAN J. LANE,
ANTONIO MARTINO, KATHLEEN
M. FRAHER, BENJAMIN C.
REYNOLDS, DENNIS S. FRANK,
MICHAEL LEMPRES, KAREN F.
BRASSFIELD, ROBERT C.
CAMPBELL, PAUL D. COLUCCI,
THOMAS C. DIRCKS, SCOTT
REED, COLLEEN SULLIVAN,
AANCHAL GUPTA, GOLDMAN
SACHS & CO. LLC, KEEFE,
BRUYETTE & WOODS, INC.,
CANACCORD GENUITY LLC,
COMPASS POINT RESEARCH &
TRADING, LLC, CRAIG-HALLUM
CAPITAL GROUP LLC, J.P.
MORGAN SECURITIES LLC, and
WEDBUSH SECURITIES LLC,

        Defendants.

Case No.  **'23CV0099 RSH DEB**

**COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES
LAWS**

<u>CLASS ACTION</u>

DEMAND FOR JURY TRIAL

Plaintiff International Union of Operating Engineers, Local No. 793, Members Pension Benefit Trust of Ontario ("Plaintiff"), by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief are based upon, *inter alia*, counsel's investigation, which included review and analysis of: (a) regulatory filings made by Silvergate Capital Corporation ("Silvergate" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) press releases, presentations, and media reports issued by and disseminated by the Company; (c) analyst and media reports concerning Silvergate; and (d) other public information regarding the Company.

I.    **INTRODUCTION**

1.    Plaintiff brings this securities class action on behalf of all persons or entities that purchased or otherwise acquired: (a) Silvergate Class A Common stock between November 11, 2020 and January 5, 2022, inclusive (the "Class Period"); (b) Silvergate Class A common stock pursuant and/or traceable to the Company's secondary public offering ("SPO") conducted on or around January 20, 2021 (the "January SPO"); and/or (c) Silvergate Class A common stock pursuant and/or traceable to the Company's SPO conducted on or around December 6, 2021 (the "December SPO," and together with the January SPO, the "Offerings").

2.    The claims asserted herein are alleged against Silvergate, certain of the Company's senior officers, members of Silvergate's Board of Directors, and the underwriters of the Offerings (collectively, "Defendants"), and arise under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act"), and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5, promulgated thereunder.

3.    Silvergate is a holding company for the U.S. federal and state chartered subsidiary bank, Silvergate Bank. Through Silvergate Bank, Silvergate functions as a depository, and recently a lender, for all major cryptocurrency platforms, including

some of the more prominent exchanges such as Coinbase, Genesis, and, until recently, FTX.

4.    A critical component of Silvergate's cryptocurrency business is its one-of-a-kind service called the Silvergate Exchange Network (the "SEN").  The SEN is the cryptocurrency world's closest approximation to the SWIFT banking system, which allows Silvergate customers to send U.S. dollars and euros between eligible counterparty SEN accounts at any time of day using the Company's application programming interface.

5.    As a federally regulated banking institution, Silvergate is subject to a wide variety of federal regulations, including anti-terrorism and anti-money laundering ("AML") legislation by the Office of Foreign Assets Control ("OFAC") and the Financial Crimes Enforcement Network ("FinCen"), including the Bank Secrecy Act ("BAS") and the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act ("USA Patriot Act") of 2001.  Among other things, those statutes impose requirements on regulated banks to establish Know Your Customer ("KYC") collection protocols, file reports for customer deposits or withdrawals, and create a protocol for suspicious activity that might indicate money laundering or other illegal activity.

6.    Throughout the Class Period, Silvergate repeatedly touted its "strong regulatory compliance program"—including its anti-money laundering policies and KYC procedures—as a foundation for its growth.  In connection with both the January SPO and the December SPO, Silvergate stated that it: maintained a robust compliance framework; was in compliance with all material aspects of applicable laws and legislation; had established appropriate AML and KYC compliance programs; and was prepared to accommodate deposit inflows and outflows and as such maintained a highly liquid balance sheet.  Silvergate also repeatedly represented that its "vision and advanced approach to compliance" was a foundation for its growth and offered a competitive edge against other institutions who wished

to enter the cryptocurrency banking market.  As a result of these misrepresentations, shares of Silvergate stock traded at artificially inflated prices throughout the Class Period.

7.    The truth began to emerge on November 7, 2022, after the market closed, when Silvergate announced the sudden and unexplained demotion of its Chief Risk Officer, Tyler Pearson—the son-in-law of CEO Alan J. Lane.  The Company replaced Pearson with Kathleen Fraher, who was then serving as Chief Operating Officer.  Social media commenters noted Silvergate's exposure to FTX and Alameda Research LLC ("Alameda") and questioned whether Pearson's demotion indicated a lack of adequate oversight of Silvergate's regulatory compliance.  In response to this news, the price of Silvergate stock declined by $11.54 per share, or 22.6%, from a closing price of $50.96 per share on November 7, 2022, to a closing price of $39.42 per share on November 8, 2022, on unusually high trading volume.

8.    Over the ensuing months, additional disclosures regarding the Company's lax compliance practices reached investors, further impacting the price of Silvergate stock.

9.    Then, on January 5, 2023, the Company disclosed that the collapse of FTX had led to a run on Silvergate Bank, causing its deposits to decline by $8.1 billion, or over 68%, over the three months ending in December 2022.  This led to an acute liquidity crunch, which forced Silvergate to sell off illiquid securities for a loss of over $700 million and to borrow $4.3 billion in short-term advances from Federal Home Loan Banks.  In response to this news, the price of Silvergate stock declined by $9.38 per share, or 42.7%, from a closing price of $21.95 per share on January 4, 2023 to a closing price of $12.57 per share on January 5, 2023, on unusually high trading volume.

10.     All told, disclosures of Silvergate's deficient compliance procedures and protocols caused the Company's stock price to decline from $50.96 per share on November 7, 2022, to just $12.57 per share on January 5, 2023.

11.     As a result of Defendants' actions detailed herein, Plaintiff and other Class members have suffered significant losses and damages.

## II.     JURISDICTION AND VENUE

12.     The claims asserted herein arise under Sections 11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§ 77k, 77l, and 77o, and Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

13.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, Section 22 of the Securities Act, 15 U.S.C. § 77v, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

14.     Venue is proper in this District under Section 22 of the Securities Act 15 U.S.C. § 77v, Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), because Silvergate's principal executive office is located in La Jolla, California, which is situated in this District, and many of the acts giving rise to the violations complained of in this action, including the preparation and dissemination of materially false and misleading statements, occurred in substantial part in this District.

15.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.     PARTIES

### A.     Plaintiff

16.     Plaintiff International Union of Operating Engineers, Local No. 793, Members Pension Benefit Trust of Ontario is a Canadian Registered Pension Plan

that provides retirement benefits to crane and heavy equipment operators, other skilled workers, and their families.  As indicated in the certification submitted herewith, Plaintiff purchased shares of Silvergate Class A Common Stock at artificially inflated prices during the Class Period, and suffered damages as a result of the violations of the federal securities laws alleged herein.

**B.    Issuer Defendant**

17.    Defendant Silvergate is a holding company for its U.S. federal and state chartered subsidiary bank, Silvergate Bank.  Incorporated in Maryland, the Company maintains its corporate headquarters at 4250 Executive Square, Suite 300, La Jolla, California.  Silvergate mainly serves the cryptocurrency industry—its customers include cryptocurrency exchanges, institutional investors, and stablecoin issuers.  Silvergate's common stock trades on NYSE under ticker symbol "SI."  As of October 31, 2022, Silvergate had over 31.65 million shares of Class A common stock outstanding, owned by hundreds or thousands of investors.

**C.    Officer Defendants**

18.    Defendant Alan J. Lane ("Lane") is, and was at all relevant times, Silvergate's Chief Executive Officer ("CEO") and a Director of the Company. Defendant Lane reviewed and signed both the January SPO Registration Statement (defined herein) and the Shelf Registration Statement (defined herein).

19.    Defendant Antonio Martino ("Martino") is, and was at all relevant times, Silvergate's Chief Financial Officer ("CFO").  Defendant Martino reviewed and signed both the January SPO Registration Statement and the Shelf Registration Statement.

20.    Defendant Kathleen M. Fraher ("Fraher") is, and was at all relevant times, one of Silvergate's senior executive officers.  From 2018 until November 7, 2022, Defendant Fraher served as Chief Operating Officer of the Company and Silvergate Bank.  Since November 7, 2022, Defendant Fraher serves as Chief Risk Officer of the Company and Silvergate Bank.

21.     Defendant Benjamin C. Reynolds ("Reynolds") is, and was at all relevant times, one of Silvergate's executive officers. Defendant Reynolds was Executive Vice President and Director of Corporate Development of Silvergate Bank from February 2019 to January 2021, when he was then appointed Chief Strategy Officer of the Company.  Defendant Reynolds was named President of Silvergate on November 7, 2022.

22.     Defendants Lane, Martino, Fraher, and Reynolds are collectively referred to herein as the "Officer Defendants."  The Officer Defendants, because of their positions with Silvergate, possessed the power and authority to control the contents of Silvergate's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.  Each of the Officer Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information, each of the Officer Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  Silvergate and the Officer Defendants are collectively referred to herein as the "Exchange Act Defendants."

**D.     Director Defendants**

23.     Defendant Dennis S. Frank ("Frank") was the Chairman of the Board of Directors of Silvergate from November 1996 to June 2021, and is presently a Director of Silvergate.  Defendant Frank reviewed the January SPO Registration Statement and the Shelf Registration Statement.  Defendant Frank signed the January SPO Registration Statement, and authorized John M. Bonino to sign the Shelf Registration Statement on his behalf as attorney-in-fact.

24.     Defendant Michael Lempres ("Lempres") is, and was at all relevant times, a Director of Silvergate and has been Chairman of the Board of Directors of Silvergate since June 2021. Defendant Lempres reviewed the January SPO Registration Statement and the Shelf Registration Statement.  Defendant Lempres signed the January SPO Registration Statement, and authorized John M. Bonino to sign the Shelf Registration Statement on his behalf as attorney-in-fact.

25.     Defendant Karen F. Brassfield ("Brassfield") is, and was at all relevant times, a Director of Silvergate.  Defendant Brassfield reviewed the January SPO Registration Statement and the Shelf Registration Statement.  Defendant Brassfield signed the January SPO Registration Statement, and authorized John M. Bonino to sign the Shelf Registration Statement on her behalf as attorney-in-fact.

26.     Defendant Robert C. Campbell ("Campbell") is, and was at all relevant times, a Director of Silvergate.  Defendant Campbell reviewed the January SPO Registration Statement and the Shelf Registration Statement.  Defendant Campbell signed the January SPO Registration Statement, and authorized John M. Bonino to sign the Shelf Registration Statement on his behalf as attorney-in-fact.

27.     Defendant Paul D. Colucci ("Colucci") is, and was at all relevant times, a Director of Silvergate.  Defendant Colucci reviewed the January SPO Registration Statement and the Shelf Registration Statement.  Defendant Colucci signed the January SPO Registration Statement, and authorized John M. Bonino to sign the Shelf Registration Statement on his behalf as attorney-in-fact.

28.     Defendant Thomas C. Dircks ("Dircks") is, and was at all relevant times, a Director of Silvergate.  Defendant Dircks reviewed the January SPO Registration Statement and the Shelf Registration Statement.  Defendant Dircks signed the January SPO Registration Statement, and authorized John M. Bonino to sign the Shelf Registration Statement on his behalf as attorney-in-fact.

29.     Defendant Scott Reed ("Reed") is, and was at all relevant times, a Director of Silvergate.  Defendant Reed reviewed the January SPO Registration

Statement and the Shelf Registration Statement.  Defendant Reed signed the January SPO Registration Statement, and authorized John M. Bonino to sign the Shelf Registration Statement on his behalf as attorney-in-fact.

30.   Defendant Colleen Sullivan ("Sullivan") is, and was at all relevant times, a Director of Silvergate.  Defendant Sullivan reviewed the January SPO Registration Statement and the Shelf Registration Statement.  Defendant Sullivan signed the January SPO Registration Statement, and authorized John M. Bonino to sign the Shelf Registration Statement on her behalf as attorney-in-fact.

31.   Defendant Aanchal Gupta ("Gupta") has served as a Director of Silvergate since June 2021.  Defendant Gupta reviewed the Shelf Registration Statement and authorized John M. Bonino to sign the Shelf Registration Statement on her behalf as attorney-in-fact.

32.   Defendants Lane, Martino, Frank, Lempres, Brassfield, Campbell, Colucci, Dircks, Reed, Sullivan, and Gupta are collectively referred to herein as the "Director Defendants."  Each of the Director Defendants, except for Defendant Gupta, signed the January SPO Registration Statement, and all of the Director Defendants signed the Shelf Registration Statement.

**E.   Underwriter Defendants**

33.   Defendant Goldman Sachs & Co. LLC ("Goldman") served as an underwriter and joint book-running manager of the January SPO and the December SPO, and sold millions of Silvergate shares in the Offerings.  As an underwriter of the Offerings, Goldman was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the January SPO Offering Materials and the December SPO Offering Materials.

34.   Defendant Keefe, Bruyette & Woods, Inc. ("KBW") served as an underwriter and joint book-running manager of the January SPO and the December SPO, and sold millions of Silvergate shares in the Offerings.  As an underwriter of the Offerings, KBW was responsible for ensuring the truthfulness and accuracy of

the various statements contained in or incorporated by reference into the January SPO Offering Materials and the December SPO Offering Materials.

35. Defendant Canaccord Genuity LLC ("Canaccord") served as an underwriter and joint book-running manager of the January SPO and sold hundreds of thousands of Silvergate shares in the January SPO. As an underwriter of the January SPO, Canaccord was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the January SPO Offering Materials.

36. Defendant Compass Point Research & Trading, LLC ("Compass") served as an underwriter of the Offerings and sold hundreds of thousands of Silvergate shares in the Offerings. As an underwriter of the Offerings, Compass was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the January SPO Offering Materials and the December SPO Offering Materials.

37. Defendant Craig-Hallum Capital Group LLC ("Craig-Hallum") served as an underwriter of the Offerings and sold hundreds of thousands of Silvergate shares in the Offerings. As an underwriter of the Offerings, Craig-Hallum was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the January SPO Offering Materials and the December SPO Offering Materials.

38. Defendant J.P. Morgan Securities LLC ("J.P. Morgan") served as an underwriter and joint book-running manager for the December SPO and sold hundreds of thousands of Silvergate shares in the December SPO. As an underwriter of the December SPO, J.P. Morgan was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the December SPO Offering Materials.

39. Defendant Wedbush Securities LLC ("Wedbush") served as an underwriter for the December SPO and sold hundreds of thousands of Silvergate

1   shares in the December SPO.  As an underwriter for the December SPO, Wedbush

2   was responsible for ensuring the truthfulness and accuracy of the various statements

3   contained in or incorporated by reference into the December SPO Offering

4   Materials.

5        40.   Defendants Goldman, KBW, Canaccord, Compass, Craig-Hallum, J.P.

6   Morgan, and Wedbush are collectively referred to herein as the "Underwriter

7   Defendants."  Silvergate, the Director Defendants, and the Underwriter Defendants

8   are collectively referred to herein as the "Securities Act Defendants."

9   **IV.   <u>BACKGROUND</u>**

10        41.   Silvergate was founded in 1988 as a community bank in southern

11   California.  In 2008, Silvergate's current CEO, Alan J. Lane, joined the Company

12   and quickly began devising plans for expansion.  By early 2013, Lane saw an

13   opportunity to grow Silvergate's business by shifting focus to the burgeoning

14   cryptocurrency industry.  Over the next several years, Silvergate went "all in" on

15   cryptocurrencies.

16        42.   During the Class Period, Silvergate's SEN provided payments, lending,

17   and funding solutions for an expanding class of digital currency companies and

18   investors.  Given the ease with which the SEN allowed parties to instantly transfer

19   currency from one account to another, Silvergate became a de facto clearinghouse

20   for many of the largest cryptocurrency investors in the world.

21        43.   By late 2020, Silvergate's most notable clients included prominent

22   exchanges such as Binance, Coinbase, Genesis, Gemini, and FTX.  As a result of the

23   SEN's popularity, the Company experienced exponential growth, increasing from

24   46,063 transactions representing $32.7 billion in deposits in 2019 to 230,815

25   transactions representing $135.7 billion in deposits by the end of 2020.

26        44.   As a federally regulated banking institution, Silvergate is subject to

27   strict regulations aimed at, among other things, creating a protocol for identifying

28   suspicious activity that might indicate potential money laundering operations and

other illegitimate activities by its customers and having procedures for reporting this kind of illicit behavior to relevant authorities.

45.    According to Europol, cryptocurrency has been increasingly used to facilitate criminal activities and to launder criminal proceeds.  In addition to using cryptocurrencies to obfuscate money flows as part of increasingly complex money laundering schemes, cryptocurrencies are increasingly used by criminals as a means of payment or as an investment fraud currency.

46.    FinCen's Final Rule on Customer Due Diligence Requirements for Financial Institutions requires that banks establish and maintain written policies and procedures for anti-money laundering and KYC protocols. Specifically, FinCen's customer identification rules require that Silvergate maintain a written Customer Identification Program appropriate for the bank's size and type of business that, at a minimum, includes "risk-based procedures for verifying the identity of each customer" that enable the bank to "form a reasonable belief that it knows the true identity of each customer" in light of the "bank's assessment of the relevant risks, including those presented by the various types of accounts maintained by the bank, the various methods of opening accounts provided by the bank, the various types of identifying information available, and the bank's size, location, and customer base." 31 C.F.R. §§ 1020.220(a)(1), (2).

47.    The Bank Secrecy Anti-Money Laundering Manual promulgated by the Federal Financial Institutions Examination Council ("FFIEC Manual") summarizes industry sound practices and examination procedures for customer due diligence on accounts that present a higher risk for money laundering and terrorist financing.

48.    The FFIEC Manual sets forth a matrix for identifying high risk accounts that require enhanced due diligence.  Such accounts include accounts that have "large and growing customers base in a wide and diverse geographic area;" or "[a] large number of noncustomer funds transfer transactions and payable upon proper identification [] transactions;" and "[f]requent funds from personal or business

accounts to or from higher-risk jurisdictions, and financial secrecy havens or jurisdictions," such as Silvergate's deposit accounts.

49.     Silvergate is required to comply with heightened due diligence for its deposit accounts.  According to the FFIEC Manual, Silvergate's due diligence is required to include assessments to determine the purpose of the account, ascertain the source and funding of the capital, identify account control persons and signatories, scrutinize the account holders' business operations, and obtaining adequate explanations for account activities.

50.     Additionally, Silvergate's general customer due diligence program is required to include protocols to predict the types of transactions, dollar volume, and transaction volume each customer is likely to conduct, and furnish a means for the bank to notice unusual or suspicious transactions for each customer.

51.     Silvergate's customer due diligence process must be able to identify any of a series of money laundering "red flags" as set forth in the FFIEC Manual, including: (a) frequent involvement of multiple jurisdictions or beneficiaries located in higher-risk offshore financial centers; (b) repetitive or unusual funds transfer activity; (c) funds transfers sent or received from the same person to or from different accounts; (d) unusual funds transfers that occur among related accounts or among accounts that involve the same or related principals; (e) transactions inconsistent with the account holder's business; (f) customer use of a personal account for business purposes; (g) multiple accounts established in various corporate names that lack sufficient business purpose to justify the account complexities; and (h) multiple high-value payments or transfers between shell companies without a legitimate business purpose.  The due diligence process must also enable Silvergate to take appropriate action once such "red flags" are identified.

## V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS CAUSE SUBSTANTIAL LOSSES TO INVESTORS

52.     The Class Period begins on November 11, 2020, which is the first

trading day after Silvergate filed its quarterly report with the SEC on Form 10-Q for the quarter ended September 30, 2020.  In that Form 10-Q, Silvergate assured investors of its rigorous approach to regulatory compliance, stating that "our vision and advanced approach to compliance complement the SEN and empower us to extend our leadership position in the industry by developing additional infrastructure solutions and services that will facilitate growth in our business."  Silvergate further stated that its ability to "[p]rovid[e] infrastructure solutions and services to the digital currency industry [] require[s] specialized compliance capabilities and a management team with a deep understanding of both the digital currency and the financial services industries" and, as such, given the "regulatory complexity," the cost and difficulty of ensuring such compliance serves as a "barrier to entry" for other banks.

53.     On January 20, 2021, Silvergate issued a press release announcing that it would conduct the January SPO, through which the Company would offer $200 million worth of shares of Class A common stock to investors, and that the Company expects to grant the underwriters a 30-day option to purchase up to an additional $30 million of shares of Class A common stock.

54.     On January 20, 2021, Silvergate filed with the SEC a Registration Statement on Form S-3ASR, Automatic Shelf Registration Statement of Securities of Well-Known Seasoned Issuers (the "January SPO Registration Statement").

55.     On January 20, 2021, Silvergate filed with the SEC a Prospectus on Form 424B5 (the "January SPO Prospectus" and, collectively with the January Registration Statement and the January SPO Underwriting Agreement (defined below), the "January SPO Offering Materials").

56.     On January 25, 2021, Silvergate filed with the SEC a Form 8-K, attaching the Underwriting Agreement by and among Silvergate and Goldman, KBW and Canaccord, dated January 21, 2021 (the "January SPO Underwriting Agreement").

57.   On January 26, 2021, Silvergate announced the completion of the January SPO.  Through the January SPO, and upon the decision of Defendants Goldman, KBW, Canaccord, Compass, and Craig-Hallum to exercise their option to purchase additional shares, Silvergate sold over 4.5 million shares of Silvergate Class A common stock at a price of $63 per share, resulting in gross proceeds of $287.50 million.

58.   The January SPO Offering Materials contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and failed to make adequate disclosures required under the rules and regulations governing the preparation of such documents.

59.   In the January SPO Prospectus, Silvergate assured investors that it carefully vetted all customers using its platform, stating "[a]s of December 31, 2020, we had over 200 prospective digital currency customer leads in various stages of our customer onboarding process and pipeline, which includes extensive regulatory compliance diligence."

60.   The January SPO Registration Statement also reiterated that Silvergate "leverage[s] [its] technology platform and [its] management team's expertise to develop solutions for many of the largest U.S. digital currency exchanges and investors around the globe," solutions which "are built on [its] deep-rooted commitment and proprietary approach to regulatory compliance."

61.   The January SPO Offering Materials also included representations that, from the onset of its cryptocurrency pursuits, the Company understood the complexity of the regulatory environment presented in the cryptocurrency industry. Specifically, the January SPO Prospectus stated that: "we believe that the market opportunity for digital currencies, the need for infrastructure solutions and services and the regulatory complexity have all expanded significantly since 2013," and as such, Silvergate's "ability to address these market dynamics over the past seven years has provided [it] with a first-mover advantage within the digital currency

industry that is the cornerstone of [its] leadership position today."

62.     In the January SPO Underwriting Agreement, which was filed with the SEC as part of the January SPO Offering Materials, Silvergate stated that "[t]he Company and each of its subsidiaries are in compliance in all material respects with all applicable laws administered by . . . a 'Regulatory Authority' including, without limitation, the Federal Reserve, the FDIC, the California Department of Financial Protection and Innovation ("CDFPI"), the Consumer Financial Protection Bureau, the Office of Foreign Assets Control of the U.S. Department of the Treasury ("OFAC") and the Financial Crimes Enforcement Network of the U.S. Department of the Treasury."

63.     On January 21, 2021, Silvergate held a conference call with analysts and investors to discuss the Company's earnings and operations for the fourth quarter of 2020.  During that call, in response to a question about Silvergate's rapid growth and the addition of new institutions to the SEN, Defendant Reynolds responded that Silvergate was continuing to "stick to [its] compliance and risk framework for evaluating those clients, and [it is] not loosening up there at all."

64.     On March 8, 2021, Silvergate filed its annual report on Form 10-K with the SEC for the year ended December 31, 2020 (the "2020 Annual Report").  In the 2020 Annual Report, Silvergate stated that it had "established appropriate anti-money laundering and customer identification programs" and "maintains records of cash purchases of negotiable instruments, files reports of certain cash transactions exceeding $10,000 (daily aggregate amount), and reports suspicious activity that might signify money laundering, tax evasion, or other criminal activities pursuant to the Bank Secrecy Act."  The 2020 Annual Report also represented that Silvergate had "implemented policies and procedures to comply with" such requirements.

65.     Although the 2020 Annual Report acknowledged risks related to the cryptocurrency industry, including that digital currency may be "exploited to facilitate illegal activity such as fraud, money laundering, tax evasion and

ransomware scams," Silvergate claimed that its compliance framework was sufficient "to institute and maintain an effective anti-money laundering program and file suspicious activity and currency transaction reports as appropriate."

66.  In the 2020 Annual Report, Silvergate further highlighted its "enhanced procedures to screen and monitor" customers "associated with [its] digital currency initiative" which Silvergate admitted "may represent an increased compliance risk given the prevalence of money laundering activities using digital currencies," but assured investors that the Company had "dedicated significant resources to [its] anti-money laundering program," in order "to comply with regulations, guidelines and examination procedures in this area."  Silvergate also stated that it "believes these enhanced procedures adequately screen and monitor [its] customers associated with the digital currency initiative for their compliance with anti-money laundering laws."

67.  The 2020 Annual Report further stated that Silvergate's "solutions and services are built on [its] deep-rooted commitment and proprietary approach to regulatory compliance . . . these capabilities are a distinct competitive advantage for [it], and provide a meaningful barrier to entry against [its] potential competitors, as there is not currently a well-established and easily navigable regulatory roadmap for competitors to serve digital currency industry customers."

68.  In the 2020 Annual Report, Silvergate also assured investors that the Company "manage[s] [its] securities portfolio and cash to maintain adequate liquidity and to ensure the safety and preservation of invested principal, with a secondary focus on yield and return."  In that regard, the 2020 Annual Report also stated that Silvergate "maintain[ed] high levels of liquidity for [its] customers who operate in the digital currency industry" and, "[i]n addition, to the extent that SEN participants fully withdraw funds from the Bank, no material liquidity issues or borrowing needs would arise since the majority of SEN participants deposits are held in liquid assets, such as available-for-sale securities and cash, or used to fund short-

term mortgage warehouse loans."

69.    On July 7, 2021, Silvergate announced a new partnership with Elliptic, a crypto asset risk management firm, to support its compliance framework.  In the announcement, Defendant Fraher stated that "[m]ost banks take a one-size-fits-all stance when it comes to crypto businesses deeming them too risky to bank. This is a narrow view as the digital currency industry continues to grow . . . [a]pplying rigorous controls to risk-based KYC and due diligence is possible through the depth and accuracy of risk exposure data that Elliptic provides on crypto businesses."

70.    On July 28, 2021, Silvergate filed with the SEC a Post-Effective Amendment to Form S-3 Registration Statement (the "Shelf Registration Statement") to register an indeterminate number of shares of Class A common stock, among other securities, which became effective upon filing,

71.    On December 6, 2021, Silvergate issued a press release announcing that it would conduct the December SPO, through which the Company would offer for sale approximately 3,310,344 shares of Silvergate's Class A common stock, and that the Company expects to grant the underwriters a 30-day option to purchase up to an additional 496,551 shares of Class A common stock.  The press release stated that the December SPO would be pursuant to the Shelf Registration Statement that the Company filed in July 2021.

72.    On December 6, 2021, Silvergate filed a prospectus supplement for the December SPO with the SEC on Form 424B5 (the "December SPO Prospectus," and, collectively with the December SPO Underwriting Agreement (defined below) and the Shelf Registration Statement, the "December SPO Offering Materials").

73.    On December 8, 2021, Silvergate filed with the SEC a Form 8-K, attaching the Underwriting Agreement by and among Silvergate and Goldman, J.P. Morgan, and KBW, dated December 6, 2021 (the "December SPO Underwriting Agreement").

74.    On December 9, 2021, Silvergate completed the December SPO.

Through the December SPO, and upon the decision of Defendants Goldman, J.P. Morgan, KBW, Compass, Craig-Hallum, and Wedbush to exercise their option to purchase additional shares, Silvergate sold more than 3.8 million shares of common stock at $145 per share, resulting in approximately $552 million in gross proceeds.

75.   The December SPO Offering Materials contained untrue statements of material fact, omitted material facts necessary to make the statements contained therein not misleading, and failed to make adequate disclosures required under the rules and regulations governing the preparation of such documents.

76.   The December SPO Prospectus reiterated that Silvergate's "solutions are built on [its] deep-rooted commitment and proprietary approach to regulatory compliance," and stated that its vision and advanced approach to compliance empowered the Company be in a leadership position.  The Company stated that: "we believe that the market opportunity for digital currencies, the need for infrastructure solutions and services and the regulatory complexity have all expanded significantly since 2013," and as such, Silvergate's "ability to address these market dynamics over the past seven years has provided [it] with a first-mover advantage within the digital currency industry that is the cornerstone of [its] leadership position today."

77.   The December SPO Prospectus further stated that from the onset of its cryptocurrency pursuits, in 2013, the Company understood the complexity of the regulatory environment presented in the cryptocurrency industry, stating that: "[p]roviding infrastructure solutions and services to the digital currency industry [] require[s] specialized compliance capabilities and a management team with a deep understanding of both the digital currency and the financial services industries," and that Silvergate's "ability to address these market dynamics over the past seven years has provided [it] with a first-mover advantage within the digital currency industry that is the cornerstone of [its] leadership position today."

78.   In the December SPO Underwriting Agreement, which was filed with the SEC as part of the December SPO Offering Materials, Silvergate further claimed

that "[t]he Company and each of its subsidiaries are in compliance in all material respects with all applicable laws administered by . . . a 'Regulatory Authority' including, without limitation, the Federal Reserve, the FDIC, the California Department of Financial Protection and Innovation ("CDFPI"), the Consumer Financial Protection Bureau, the Office of Foreign Assets Control of the U.S. Department of the Treasury ("OFAC") and the Financial Crimes Enforcement Network of the U.S. Department of the Treasury."

79.   On January 18, 2022, Silvergate held a conference call with analysts and investors to discuss the Company's earnings and operations for the fourth quarter of 2021.  On that call, Defendant Martino stated that Silvergate's total risk-based capital ratio reflects that "a large proportion of [the Company's] deposits are held in cash and in high grade and highly liquid securities."

80.   On February 28, 2022, Silvergate filed its Form 10-K with the SEC for the year ended December 31, 2021 (the "2021 Annual Report").  The 2021 Annual Report repeated the same false and misleading statements set forth above in ¶¶ 64-68.

81.   The 2021 Annual Report also claimed that Silvergate's onboarding process "includes extensive regulatory compliance diligence" and its "solutions and services are built on [its] deep-rooted commitment and proprietary approach to regulatory compliance."  In addition, Silvergate claimed that "these capabilities are a distinct competitive advantage for [the Company], and provide a meaningful barrier to entry against our potential competitors."

82.   In the 2021 Annual Report, Silvergate assured that the Company "manage[s] [its] securities portfolio and cash to maintain adequate liquidity and to ensure the safety and preservation of invested principal, with a secondary focus on yield and return."  In addition, the 2021 Annual Report claimed that Silvergate "maintain[ed] high levels of liquidity for [its] customers who operate in the digital currency industry" and, "[i]n addition, to the extent that SEN participants fully

withdraw funds from the Bank, no material liquidity issues or borrowing needs would arise since the majority of SEN participants deposits are held in liquid assets, such as available-for-sale securities and cash, or used to fund short-term mortgage warehouse loans."

83.    The 2021 Annual Report again noted that SEN is the primary profit driver for the Company and claimed that "[t]his unique source of funding is a distinct advantage over most traditional financial institutions and allows us to generate revenue from a conservative portfolio of investments in cash, short term securities and certain types of loans that we believe generate attractive risk-adjusted returns." The 2021 Annual Report further claimed that "[o]ur deposits serve as the primary funding source for lending, investing and other general banking purposes, and one of the key elements of our financial success is our low-cost deposit base."

84.    On June 2, 2022, Defendant Lane appeared on the Bloomberg podcast, Odd Lots.  During the podcast, Defendant Lane assured investors that Silvergate only works with exchanges that are serious about regulatory requirements, stating that we work with "anybody that is serious about regulation. And that's an important distinction, because they have to satisfy not only their own legal and regulatory requirements, but then we have to verify that their compliance programs are sound."

85.    On November 7, 2022, Silvergate filed its quarterly report for the third quarter ending September 30, 2022 with the SEC on Form 10-Q.  In that report, Silvergate highlighted the Company's compliance with regulatory requirements, stating "[a]s of September 30, 2022, we had over 300 prospective digital asset customer leads in various stages of our customer onboarding process and pipeline, which includes extensive regulatory compliance diligence."  The report also claimed that "the Company's Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures were effective as of September 30, 2022."

86.    The statements set forth in ¶¶ 52, 59-69, 76-85 were materially false

and misleading.  In truth, Silvergate had not established appropriate anti-money laundering and customer identification programs, and its regulatory compliance framework lacked sufficient controls and procedures to detect money laundering and other fraudulent conduct, including an egregious fraud perpetrated by Silvergate customers FTX and Alameda.  Moreover, Silvergate had significant exposure to FTX and Alameda in that it was sure to face regulatory scrutiny for a failure to detect or report on FTX's and Alameda's fraudulent conduct.  The reality is Silvergate's regulatory framework did not offer a competitive edge, rather it attracted bad actors that used Silvergate's platform in furtherance of fraud and other criminal activity.  Lastly, the Company's statements that it maintained sufficient liquid assets to protect against a bank run are false as Silvergate held its investments in illiquid securities.

87.  On November 2, 2022, CoinDesk published documents showing Alameda—a trading firm focused on cryptocurrencies and founded by FTX founder Sam Bankman-Fried—was holding almost 40% of Alameda's assets in FTT, a proprietary coin issued by FTX.  This disclosure triggered a sell-off of FTT coins that materially reduced the value of that currency, as well as a massive exit of customers from FTX.  Over the next several days, FTX and Alameda were exposed for conducting a massive embezzlement scheme, FTX was forced to seek bankruptcy protection, and, eventually, Bankman-Fried was indicted for fraud, among other crimes.

88.  Silvergate, as one of the cryptocurrency industry's leading banking institutions, was also impacted by FTX's collapse and the growing ramifications for the Company's other customers.  Indeed, Silvergate was one of FTX and Alameda's largest banking partners, as Silvergate's SEN was used to facilitate trades for FTX and Alameda.

## VI.   **THE TRUTH EMERGES**

89.  The truth about Silvergate's deficient compliance procedures and protocols began to emerge on the evening of November 7, 2022, when Silvergate

announced the sudden and unexplained demotion of its Chief Risk Officer, Tyler Pearson, who is the son-in-law of Silvergate's CEO, Defendant Lane. The Company replaced Pearson with the Company's then-Chief Operating Officer, Defendant Fraher, who had also previously served as Vice President, Chief Compliance and Bank Secrecy Act Officer for Silvergate Bank.

90.     The following day, November 8, 2022, social media erupted over Pearson's demotion, noting that this was an indication of lack of adequate oversight of Silvergate's regulatory compliance, as well as exposure to the FTX/Alameda fraud. Marcus Aurelius Value Research ("AV Research") tweeted a snapshot of Silvergate's website with a quote from Sam Bankman-Fried that read, "[l]ife as a crypto firm can be divided up into before Silvergate and after Silvergate—it's hard to overstate how much it revolutionized banking for blockchain companies." The tweet was accompanied by a caption that read, "[h]ow long until the new $SI 'Risk officer' takes this down?" These disclosures caused the price of Silvergate stock to decline by 22.6%, from a closing price of $50.96 per share on November 7, 2022, to a closing price of $39.42 on November 8, 2022.

91.     On November 9, 2022, *S&P Global* published an article warning of Silvergate's exposure to FTX. That article quoted BTIG, LLC ("BTIG"), analysts Mark Palmer and Andrew Harte stating that "FTX is 'among the most prominent users' of Silvergate's SEN Network." These disclosures caused the price of Silvergate stock to decline by 12%, from a closing price of $39.42 per share on November 8, 2022, to a closing price of $34.69 per share on November 9, 2022.

92.     In response to these allegations, Silvergate released a statement assuring investors that "as a prudentially regulated bank" the Company maintains "a strong capital position in excess of the well-capitalized status required by federal banking regulations." and that its underwritten bitcoin collateralized loans "continue[] to perform as expected with zero losses and zero forced liquidations." In addition, Defendant Reynolds told Mark Palmer of BTIG that "FTX's challenges

have had no direct impact on the company."

93.     The statements set forth above in ¶ 92 were materially false and misleading.   In truth, Silvergate had not established appropriate anti-money laundering and customer identification programs, and its regulatory compliance framework lacked sufficient controls and procedures to detect money laundering and other fraudulent conduct, including an egregious fraud perpetrated by Silvergate customers FTX and Alameda.   Moreover, Silvergate had significant exposure to FTX and Alameda that exposed the Company to significant regulatory scrutiny for a failure to detect or report on FTX's and Alameda's fraudulent conduct.   As a result, Silvergate was also exposed to a loss of confidence from other customers, which triggered an exodus of depositors from its platform.

94.     Then on November 15, 2022, AV Research revealed that Silvergate was implicated in a $425 million money laundering operation by a South American cryptocurrency crime ring linked to smugglers and /drug traffickers.   AV Research tweeted, "[r]ecently subpoenaed Silvergate bank records reveal $425 million in transfers from $SI crypto bank accounts to South American money launderers.  Affadavit from investigation into crypto crime ring linked to smugglers/drug traffickers."   That same day, Marc Cohodes, a short seller famous for exposing corporate fraud, publicly compared Silvergate's know-your-customer and anti-money laundering compliance to that of the "banks who did business with Madoff."

95.     These disclosures caused the price of Silvergate stock to decline by 17.3%, from a closing price of $35.49 per share on November 14, 2022, to a closing price of $29.36 per share on November 15, 2022.

96.     On November 15, after the market closed, BTIG analysts Mark Palmer and Andrew Harte reported that "assertion[s] about SI floated through social media today" including "that the company does not perform know-your-customer (KYC) or anti-money laundering (AML) screening, as supposedly evidenced by the fact that it accepted deposits from FTX."   The analysts offered reassurance from Silvergate's

President, Reynolds, who noted that "the extent of SI's relationship with FTX was limited to deposits, adding that depositors, unlike borrowers, do not submit to the company all of their business records for review."  Reynolds further commented that "SI as a highly regulated bank with a California state charter and membership in the Federal Reserve System has its controls, including its KYC and AML policies, reviewed on a regular basis."

97.    On November 17, 2022, short seller The Bear Cave, published a newsletter providing additional details on Silvergate's connection to the South American money-laundering operation reporting that hundreds of millions of dollars were laundered through Silvergate's SEN platform, emphasizing Silvergate's lack of compliance monitoring and reporting protocols given "[t]he accounts were receiving funds in the same pattern as those . . . used to facilitate the laundering of illicit funds."  This operation began in September 2021 and ended in June 2022. Silvergate did not report suspicious activity on these accounts until federal investigators requested documents.

98.    Despite the misleading assurances provided by President Reynolds in ¶ 96, these disclosures caused the price of Silvergate stock to decline by 11%, from a closing price of $31.34 per share on November 16, 2022, to a closing price of $27.90 per share on November 17, 2022.

99.    The following day, November 18, 2022, FalconX, a cryptocurrency exchange platform focused on risk management for institutional clients, revealed that it would no longer engage with Silvergate due to the elevated risk associated with the SEN platform, stating that its decision was "consistent with other market players."

100.    As a result of this disclosure, the price of Silvergate shares declined by 10.7%, from a closing price of $27.90 per share on November 17, 2022, to a closing price of $24.90 per share on November 18, 2022.

101.    On November 28, 2022, Bloomberg published a report implicating

Silvergate as a key facilitator of the FTX/Alameda fraud.  The article revealed that FTX customers "wired $8 billion to Alameda" over the years and that customers were wiring these funds using Alameda accounts at Silvergate.

102.   These disclosures caused the price of Silvergate shares to decline by 11.1%, from a closing price of $29.14 per share on Friday, November 25, 2022, to a closing price of $25.90 per share on Monday, November 28, 2022.

103.   Then, on December 1, 2022, The Bear Cave published another report, providing additional evidence of Silvergate's involvement in a money laundering operation in December of 2018.  The Bear Cave cited a July 2021 plea agreement between the Department of Justice and Joel Greenberg, who has since been convicted of embezzlement, that describes how Greenberg used Silvergate's SEN platform to launder $200,000.  The report highlighted Silvergate's failure to identify and report 40 suspicious transactions that occurred over a four-day period.

104.   These disclosures caused the price of Silvergate stock to decline by 8.1%, from a closing price of $27.43 per share on November 30, 2022, to a closing price of $25.22 per share on December 1, 2022.

105.   On December 5, 2022, before the market opened, Silvergate issued select preliminary fourth quarter 2022 financial metrics and hosted a business update conference call.  Before market opened, Morgan Stanley analyst, Manan Gosalia, lowered Silvergate's recommendation grade from equal weight to underweight, citing Silvergate's exposure to "massive financial pressure in the aftermath of the FTX exchange's collapse" and ensuing litigation.

106.   These disclosures caused the price of Silvergate stock to decline by 8.5%, from a closing price of $26.49 per share on December 2, 2022, to a closing price of $24.24 on December 5, 2022.

107.   On December 5, 2022, after the market closed, Defendant Lane wrote in a letter filed with the SEC that the Company has "robust risk management controls," emphasizing that the Company continues "to monitor account activity as

part of our enhanced due diligence process on each of these accounts and to take action when there are red flags," and insisting that the Company takes its risk management and compliance responsibilities "extremely seriously." Further highlighting that the Company "conducted extensive due diligence on FTX and Alameda Research." Also assuring investors that Silvergate is "purpose[ly] built" to "support [its] customers not only during periods of growth but also in periods of volatility – that is, [its] business is designed to accommodate deposit inflows and outflows under a range of market conditions."

108. The statements set forth above in ¶ 107 were materially false and misleading. In truth, Silvergate had not established appropriate anti-money laundering and customer identification programs, and its regulatory compliance framework lacked sufficient controls and procedures to detect money laundering and other fraudulent conduct, including an egregious fraud perpetrated by Silvergate customers FTX and Alameda. Moreover, Silvergate was implicated in multi-million-dollar money laundering operations using its SEN platform, that Silvergate either failed to detect or failed to report. At the least, Silvergate faces regulatory scrutiny for a failure to detect or report on FTX's and Alameda's fraudulent conduct. As a result, Silvergate was also exposed to a loss of confidence from other customers, which triggered a mass exodus of depositors from its platform rendering the business unprofitable.

109. On the morning of December 6, 2022, it was revealed that on December 5, 2022, Senators Elizabeth Warren and John Kennedy, and Representative Roger Marshall sent Defendant Lane a request for information about Silvergate's relationship with FTX and Alameda casting further doubt on whether the Company maintained effective regulatory and compliance procedures and controls. Specifically, the letter stated that "Silvergate's failure to take adequate notice of [the FTX] scheme suggests that it may have failed to implement or maintain an effective anti-money laundering program."

110.   The same morning, NBC News reported that an investment manager provided testimony to the Senate Banking Committee of statements made to him by a former FTX employee confirming that as FTX's primary banking partner, Silvergate was implicated in the transfers of FTX customer funds between other Bankman-Fried controlled entities, including Alameda.

111.   These disclosures caused the price of Silvergate stock to decline by 4.7%, from a closing price of $24.24 per share on December 5, 2022, to a closing price of $23.10 per share on December 6, 2022.

112.   On December 13, 2022, the SEC and the Commodity Futures Trading Commission ("CFTC") both filed civil actions against Bankman-Fried.  According to the complaints, FTX directed customers to deposit fiat currency into U.S. bank accounts controlled by Alameda.  Importantly, the complaints revealed that "some or all of those bank accounts were opened in the name of the entity called North Dimension, a Delaware-registered wholly-owned subsidiary of Alameda."  North Dimension was a shell company used by FTX and Alameda to misappropriate customer funds using Silvergate's SEN network.

113.   These disclosures caused the price of Silvergate stock to decline by 11.9%, from a closing price of $21.26 per share on December 12, 2022, to a closing price of $18.73 on December 13, 2022.

114.   On January 5, 2023, a day after a federal judge ordered the seizure of about $93 million of FTX funds held at Silvergate, the Company released select preliminary fourth quarter financial metrics in an intra quarter update.  In the release, Silvergate disclosed that the collapse of FTX had led to a run on the bank, causing its deposits to decrease by more than 60% or $8.1 billion in the fourth quarter—a bank run that *The Wall Street Journal* dubbed "worse than great depression-era runs."

115.   The same day, Silvergate held a conference call with analysts and investors to discuss the intra-quarter update.  On that call, Defendant Lane

1   acknowledged that there was a "crisis of confidence" across the cryptocurrency or

2   digital asset ecosystem.  To ensure it had enough capital for future deposit outflows,

3   Silvergate sold $5.2 billion worth of illiquid mortgage-backed securities, taking a

4   loss of over $700 million.  The Company also revealed that it had tapped $4.3 billion

5   in short term financing in from Federal Home Loan Banks to further shore up its

6   depleted balance sheet.

7   116.   These disclosures caused the price of Silvergate stock to decline by

8   42.7%, from a closing price of $21.95 per share on January 4, 2023, to a closing

9   price of $12.57 per share on January 5, 2023.

10   117.   In response to these disclosures, on January 9, 2023, analyst David

11   Chiaverini of Wedbush Securities reported that if the bank had invested in three-

12   month treasury bills instead of three-year mortgage-backed securities, Silvergate's

13   "tangible book value would be closer to $46/share instead of our new estimate of

14   $9/share."

15   **VII.   LOSS CAUSATION**

16   118.   During the Class Period, as detailed herein, Silvergate and the Officer

17   Defendants made materially false and misleading statements and omissions, and

18   engaged in a scheme to deceive the market.  These misleading statements and

19   omissions artificially inflated the price of Silvergate shares and operated as a fraud

20   or deceit on the Class (as defined below).  Later, when the alleged misrepresentations

21   and fraudulent conduct were disclosed to the market on November 7, 2022,

22   November 9, 2022, November 15, 2022, November 17, 2022, November 18, 2022,

23   November 28, 2022, December 1, 2022, December 5, 2022, December 13, 2022, and

24   January 5, 2023, the price of Silvergate shares fell precipitously as the prior artificial

25   inflation came out of the price over time.  As a result of their purchases of Silvergate

26   shares during the Class Period, Plaintiff and other members of the Class suffered

27   economic loss, *i.e.*, damages, under the federal securities laws.

28

## VIII.  CLASS ACTION ALLEGATIONS

119.   Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons or entities that purchased or otherwise acquired: (a) Silvergate Class A Common stock during the Class Period; (b) Silvergate Class A common stock pursuant and/or traceable to the January SPO; and/or (c) Silvergate Class A common stock pursuant and/or traceable to the December SPO (collectively, the "Class").  Excluded from the Class are Defendants and their families, directors, and officers of Silvergate and their families and affiliates.

120.   The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of October 31, 2022, Silvergate had over 31.65 million shares of common stock outstanding, owned by hundreds or thousands of investors.

121.   There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)   Whether Defendants violated the Securities Act and/or the Exchange Act;

(b)   Whether Defendants omitted and/or misrepresented material facts;

(c)   Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)   Whether the Officer Defendants and Director Defendants are personally liable for the alleged misrepresentations and omissions described herein;

(e)   Whether the Exchange Act Defendants knew or recklessly

disregarded that their statements and/or omissions were false and misleading;

(f)     Whether Defendants' conduct impacted the price of Silvergate common stock;

(g)     Whether Defendants' conduct caused the members of the Class to sustain damages; and

(h)     The extent of damage sustained by Class members and the appropriate measure of damages.

122.   Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from the Exchange Act Defendants wrongful conduct.

123.   Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

124.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.   Joinder of all Class members is impracticable.

## IX.     INAPPLICABILITY OF STATUTORY SAFE HARBOR

125.   Silvergate's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

126.   The Exchange Act Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of Silvergate who knew that the statement was false.  None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or

forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## X.    PRESUMPTION OF RELIANCE

127.   At all relevant times, the market for Silvergate common stock was an efficient market for the following reasons, among others:

(a)    Silvergate shares met the requirements for listing, and was listed and actively traded on NYSE, a highly efficient and automated market;

(b)    As a regulated issuer, Silvergate filed periodic public reports with the SEC and NYSE;

(c)    Silvergate regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Silvergate was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s).  Each of these reports was publicly available and entered the public marketplace.

128.   As a result of the foregoing, the market for Silvergate shares promptly digested current information regarding Silvergate from all publicly available sources and reflected such information in the price of Silvergate common stock.  Under these circumstances, all purchasers of Silvergate common stock during the Class Period suffered similar injury through their purchase of Silvergate common stock at artificially inflated prices and the presumption of reliance applies.

129.   A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose

material adverse information regarding Silvergate's business operations—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Company's regulatory adequacy and liquid assets, that requirement is satisfied here.

## XI. SCIENTER ALLEGATIONS

130. As alleged herein, the Exchange Act Defendants acted with scienter since the Exchange Act Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Officer Defendants, by virtue of their receipt of information reflecting the true facts regarding Silvergate, their control over, and/or receipt and/or modification of Silvergate's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Silvergate, participated in the fraudulent scheme alleged herein.

## XII. CLAIMS FOR RELIEF

### COUNT I

### For Violations of Section 10(b) of the Exchange Act

### and SEC Rule 10b-5 Promulgated Thereunder

### (Against the Exchange Act Defendants)

131. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

132. During the Class Period, the Exchange Act Defendants carried out a

plan, scheme, and course of conduct which intended to and, throughout the Class Period, did: (a) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (b) cause Plaintiff and other members of the Class to purchase Silvergate Class A common stock at artificially inflated prices.

133.   The Exchange Act Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

134.   The Exchange Act Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the U.S. mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

135.   During the Class Period, the Exchange Act Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

136.   The Exchange Act Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or recklessly disregarded the true facts that were available to them.  The Exchange Act Defendants engaged in this misconduct to conceal Silvergate's true condition from the investing public and to support the artificially inflated prices of the Company's stock.

137.   Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they purchased Silvergate stock at artificially inflated prices and were harmed when the truth about Silvergate negatively impacted the price of

the Company's stock.  Plaintiff and the Class would not have purchased Silvergate stock at the prices they paid, or at all, had they been aware that the market prices for Silvergate common stock had been artificially inflated by the Exchange Act Defendants' fraudulent course of conduct.

138.   As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's stock during the Class Period.

139.   By virtue of the foregoing, the Exchange Act Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT II

### For Violations of Section 20(a) of the Exchange Act

### (Against the Officer Defendants)

140.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

141.   The Officer Defendants acted as controlling persons of Silvergate within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions, participation in and awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and intimate knowledge of the Company's actual performance, and their power to control public statements about Silvergate, the Officer Defendants had the power and ability to control the actions of Silvergate and its employees.  By reason of this conduct, the Officer Defendants are liable under Section 20(a) of the Exchange Act.

## COUNT III

### For Violations of Section 11 of the Securities Act

### (Against the Securities Act Defendants)

142.   Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

143.   This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all members of the Class who purchased or otherwise acquired Silvergate Class A common stock in and/or traceable to the January SPO and/or December SPO and who were damaged thereby.

144.   The January SPO Offering Materials and the December SPO Offering Materials contained untrue statements of material facts, omitted to state other facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

145.   Silvergate is the registrant for the Offerings and as the issuer of the shares is strictly liable to Plaintiff and members of the Class for the misstatements and omissions in the January SPO Offering Materials and the December SPO Offering Materials.

146.   The Securities Act Defendants are responsible for and are liable for the contents and dissemination of the January SPO Offering Materials and/or December SPO Offering Materials.

147.   None of the Securities Act Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the January SPO Offering Materials and/or the December SPO Offering Materials were true and without omissions of any material facts and were not misleading.

148.   By reason of the conduct alleged herein, each Securities Act Defendant violated Section 11 of the Securities Act.

149.   The value of Silvergate common stock has declined substantially as a result of Defendants' violations, causing damage to those members of the Class that purchased or otherwise acquired Silvergate Class A common stock in and/or traceable to the January SPO and/or December SPO.

150.   At the time of their purchases of Silvergate common stock, Plaintiff and other members of the Class were without knowledge of the facts concerning the

wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.  Less than one year has elapsed from the time that Plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that Plaintiff commenced this action.  Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public through the January SPO and the December SPO and the time Plaintiff commenced this action.

## COUNT IV

### For Violations of Section 12(a)(2) of the Securities Act
### (Against the Underwriter Defendants)

151.   Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

152.   This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 771(a)(2), on behalf of all members of the Class who purchased or otherwise acquired Silvergate Class A common stock in and/or traceable to the January SPO and December SPO and who were damaged thereby.

153.   This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act. For purposes of asserting this Count, Plaintiff does not allege that the Underwriter Defendants acted with scienter or fraudulent intent, which are not elements of a Section 12(a)(2) claim.

154.   The Underwriter Defendants were statutory sellers of Silvergate shares that were registered in the January SPO pursuant to the January SPO Registration Statement and the December SPO pursuant to the Shelf Registration Statement and sold by means of the January SPO Offering Materials and December SPO Offering Materials.  By means of the January SPO Offering Materials and/or December SPO Offering Materials, the Underwriter Defendants sold millions of Silvergate shares

through the January SPO and December SPO to members of the Class. The Underwriter Defendants were at all relevant times motivated by their own financial interests. In sum, the Underwriter Defendants were sellers, offerors, and/or solicitors of sales of the stock that was sold in the January SPO and/or the December SPO by means of the materially false and misleading Offering Materials.

155. The January SPO Offering Materials and December SPO Offering Materials contained untrue statements of material fact and omitted other facts necessary to make the statements not misleading, and failed to disclose material facts, as set forth above.

156. Less than one year has elapsed since the time that Plaintiff discovered, or could reasonably have discovered, the facts upon which this Complaint is based. Less than three years has elapsed since the time that the securities at issue in this Complaint were bona fide offered to the public.

157. By the reason of the foregoing, the Underwriter Defendants are liable for violations of Section 12(a)(2) of the Securities Act to Plaintiff and the other members of the Class who purchased Silvergate Class A common shares in and/or traceable to the January SPO and/or the December SPO, and who were damaged thereby.

**COUNT V**

**For Violations of Section 15 of the Securities Act**

**(Against the Director Defendants)**

158. Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

159. This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of all members of the Class who purchased or otherwise acquired Silvergate Class A common stock in and/or traceable to the January SPO and/or the December SPO and who were damaged thereby.

160. The Director Defendants were controlling persons of Silvergate by

virtue of their positions as directors and/or senior officers of Silvergate. The Director Defendants each had a series of direct and indirect business and personal relationships with other directors and officers and major stockholders of Silvergate.

161. The Director Defendants' positions made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiff and the Class.

162. The Director Defendants acted as controlling persons of Silvergate within the meaning of Section 15 of the Securities Act. By reason of their voting power, ownership, rights as against Silvergate, and/or specific acts, the Director Defendants had the power to control Silvergate's operations and its decision-making processes. By reason of such control, Director Defendants are liable under Section 15 of the Securities Act.

163. By virtue of the conduct alleged herein, the Director Defendants are liable for the above-stated wrongful conduct and are liable to Plaintiff and the Class for damages suffered.

## XIII. <u>**PRAYER FOR RELIEF**</u>

WHEREFORE, Plaintiff prays for judgment as follows:

A. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding compensation to Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D. Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

1

## XIV. <u>JURY DEMAND</u>

2       Plaintiff demands a trial by jury.

3

    DATED: January 19, 2023        Respectfully submitted,

4

5                                  **BERNSTEIN LITOWITZ BERGER**
                                   **& GROSSMANN LLP**

6

7                                  /s/ Jonathan D. Uslaner
                                   JONATHAN D. USLANER (Bar No. 256898)
8                                  (jonathanu@blbglaw.com)
                                   2121 Avenue of the Stars, Suite 2575
9                                  Los Angeles, CA 90067
                                   Tel:    (310) 819-3470

10                                         -and-

11                                 HANNAH ROSS
                                   (hannah@blbglaw.com)
12                                 JOHN RIZIO-HAMILTON
                                   (johnr@blbglaw.com)
13                                 AVI JOSEFSON
                                   (avi@blbglaw.com)
14                                 SCOTT R. FOGLIETTA
                                   (scott.foglietta@blbglaw.com)
15                                 1251 Avenue of the Americas
                                   New York, NY 10020
16                                 Tel:    (212) 554-1400
                                   Fax:    (212) 554-1444
17

18                                 *Counsel for Plaintiff International Union of*
                                   *Operating Engineers, Local No. 793, Members*
19                                 *Pension Benefit Trust of Ontario*

20

21

22

23

24

25

26

27

28

**CERTIFICATION PURSUANT TO
THE FEDERAL SECURITIES LAWS**

I, Joseph Redshaw, on behalf of International Union of Operating Engineers, Local No. 793, Members Pension Benefit Trust of Ontario ("Local 793"), hereby certify, as to the claims asserted under the federal securities laws, that:

1.  I am a Trustee of Local 793 and I am authorized to sign this certification on its behalf.  I have reviewed the complaint and authorize its filing by counsel.

2.  Local 793 did not purchase or sell the securities that are the subject of this action at the direction of counsel or in order to participate in any action arising under the federal securities laws.

3.  Local 793 is willing to serve as a representative party on behalf of the Class, including providing testimony at deposition and trial, if necessary.

4.  Local 793's transactions in the Silvergate Capital Corporation securities that are the subject of this action are set forth in the chart attached hereto.

5.  Local 793 has sought to serve and was appointed as a lead plaintiff and representative party on behalf of a class in the following action under the federal securities laws filed during the three-year period preceding the date of this Certification:

    *Firemen's Retirement System of St. Louis v. Telos Corporation*, No. 22-cv-135 (E.D. Va.)

6.  Local 793 has sought to serve as a lead plaintiff and representative party on behalf of a class in the following action under the federal securities laws filed during the three-year period preceding the date of this Certification, but either withdrew its motion for appointment as lead plaintiff or was not appointed lead plaintiff:

    *Doyle v. Reata Pharmaceuticals, Inc.*, No. 21-cv-987 (E.D. Tex.)

7.  Local 793 will not accept any payment for serving as a representative party on behalf of the Class beyond Local 793's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the Class, as ordered or approved by the Court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed this ___ day of January, 2023.

_____
Joseph Redshaw, Trustee
*International Union of Operating Engineers, Local
No. 793, Members Pension Benefit Trust of Ontario*

**International Union of Operating Engineers, Local No. 793,**
**Members Pension Benefit Trust of Ontario**
**Transactions in Silvergate Capital Corporation**

| **Transaction** | **Date** | **Shares** | **Price** |
|---|---|---|---|
| Purchase | 11/5/2021 | 189 | $215.1600 |
| Purchase | 11/8/2021 | 3,355 | $216.3138 |
| Purchase | 12/7/2021 | 591 | $145.0000 |
| Purchase | 1/25/2022 | 1,602 | $99.9691 |
| Purchase | 10/19/2022 | 1,845 | $54.1443 |
| | | | |
| Sale | 1/10/2022 | (81) | $119.0068 |
| Sale | 1/28/2022 | (99) | $92.4932 |
| Sale | 2/8/2022 | (85) | $120.1310 |
| Sale | 3/28/2022 | (873) | $152.0319 |
| Sale | 4/1/2022 | (513) | $149.3628 |
| Sale | 4/11/2022 | (546) | $125.2589 |
| Sale | 11/10/2022 | (5,385) | $32.8950 |